[Cite as *State v. Ruediger*, 2024-Ohio-1975.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                                       No. 112830

    v.                           :

JOHN RUEDIGER,                          :

    Defendant-Appellant.         :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 23, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-659443-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Fallon Radigan and Melissa Riley, Assistant Prosecuting Attorneys, *for appellee.*

Law Office of John T. Forristal and John T. Forristal, *for appellant.*

LISA B. FORBES, J.:

{¶ 1} John Ruediger ("Ruediger") appeals his conviction for disseminating matter harmful to juveniles. After reviewing the facts of the case and pertinent law, we affirm the trial court's decision.

## I. Facts and Procedural History

{¶ 2} In April 2021, Ruediger and K.V., who is the juvenile victim in this case, began exchanging messages on Grindr, which is a dating website used primarily by gay men, and Snapchat, which is a phone application primarily used for temporarily sharing photos and messages. K.V. was 13 years old at the time and living with his parents. On April 25, 2021, at approximately midnight, Ruediger went to K.V.'s house to meet in person. Ruediger approached K.V.'s house through the backyard and saw K.V. through the first-floor bathroom window. Ruediger left shortly after arriving.

{¶ 3} K.V. woke up the next morning to his mom "screaming" at him that "there was a dude at the house." K.V.'s mom had "went through" K.V.'s phone and found out that a man was walking around their backyard. K.V.'s parents also discovered pictures of K.V.'s genitalia and electronic messages between K.V. and Ruediger on K.V.'s phone. K.V.'s parents reviewed their home security surveillance video, which showed Ruediger walking up to the bathroom window. K.V.'s parents reported these events to the police, who took K.V.'s phone and began investigating Ruediger.

{¶ 4} On April 29, 2021, Ruediger messaged K.V. via Snapchat. The police, posing as K.V., responded, and ultimately Ruediger agreed to meet K.V. at a bagel shop. When Ruediger arrived at the bagel shop, he was arrested.

{¶ 5} On May 10, 2021, Ruediger was indicted for illegal use of minor in nudity-oriented material in violation of R.C. 2907.323(A)(1) and disseminating

matter harmful to juveniles in violation of R.C. 2901.31(A)(1). Ruediger filed a motion to suppress, and the court held a hearing on this motion on March 29, 2023. At the hearing, after the evidence was presented, the court reserved ruling on the motion.

{¶ 6} The case proceeded to trial, and on April 4, 2023, a jury acquitted Ruediger of the first charge and found him guilty of disseminating matter harmful to juveniles. The court sentenced Ruediger to 12 months in prison.

{¶ 7} Ruediger now appeals raising six assignments of error for our review:

I. Trial court erred when it denied [Ruediger's] motion to suppress.

II. The trial court erred in denying [Ruediger's] Criminal Rule 29 motion on the R.C. 2907.31 disseminating matter harmful to juveniles charge.

III. The jury guilty verdict was against the manifest weight of evidence.

IV. The trial court committed plain error in failing to provide a jury instruction for an inferior degree of the disseminating matter harmful to juveniles charge.

V. Trial court erred allowing pictures into evidence that were not accurate re-creations of the scene.

VI. Defense counsel rendered ineffective assistance at trial, in derogation of * * * Ruediger's 6th Amendment right to counsel.

## II.   Trial Testimony and Evidence

### A. Natika A. Anderson

{¶ 8} Natika A. Anderson ("Natika") testified that she is K.V.'s mother, and K.V. was 15 years old at the time of trial. Natika lives in Mayfield Heights with K.V. and her two other children. In April 2021, when the incident at issue in this case

happened, K.V. was in the 8th grade. According to Natika, K.V. is "very introverted, shy. * * * Just fun-loving, peaceful. He's my peace maker, if you will." K.V. had a cell phone, on which he did a lot of "gaming," and his phone had "a lot of different apps," such as Facebook, Instagram, and Snapchat. According to Natika, she "look[ed] through [K.V.'s] phone all the time."

{¶ 9} Natika testified that prior to April 2021, K.V. was diagnosed with adolescent epilepsy, and at times, "he'll be looking at you, but * * * it's like he's not there." K.V. also suffers from lupus and attention-deficit disorder. Given the medications K.V. was taking for these issues, his "digestive system [was] in turmoil and we expected him to be in the bathroom a lot * * *." According to Natika, sometimes K.V. "would be in the bathroom literally three hours." Natika said the family would not monitor K.V.'s cell phone usage when he was in the bathroom.

{¶ 10} On April 25, 2021, Natika got her second Covid booster shot and went to bed that evening "around 10:00." K.V. was in the bathroom. Natika woke up "around midnight" and K.V. was still in the bathroom. She said, "Dude, are you still in the bathroom?" K.V. answered, "Yeah." Natika testified that she opened the bathroom door just enough to drop her clothes down the laundry chute, "and, for whatever reason, just a cold breeze swept over me." Natika testified that she wondered why the bathroom window was open. Natika went into the living room, and she and her older daughter, who is K.V.'s sister, "laugh[ed] it off" and talked about how K.V. "has just discovered porn or something. * * * [B]ecause it's no way you're spending six, seven hours in the bathroom doing absolutely nothing."

{¶ 11} Natika and her husband, who is K.V.'s father, woke up the next morning and went through K.V.'s phone. That is when they "discovered the pictures." Natika testified in detail as follows: "So it was explicit images of male genitalia, including my son's genitals, fully erect, ejaculating, and conversation, which I didn't see at that point. But I did see pictures of very graphic, disturbing pictures for a young man to have on his phone." According to Natika, the "user name" at the top of these pictures, which were posted on Snapchat, was "John R." Natika testified that she also saw "text * * * in blue from John that says, 'Yes, as soon as I saw you.'" Natika and her husband realized that meant "someone was here," and she told her husband to "pull the cameras."

{¶ 12} Natika testified that there are cameras "in our back yard and in [K.V.'s] room" because of his seizures. Natika identified video footage taken of her back porch in the "early morning" of April 25, 2021. This video showed someone "coming on to [the back] porch in the middle of the night." This person "approached the downstairs bathroom window," which is "outside of [K.V.'s] bedroom." A video from another camera on the house showed this person "rapidly exiting." Natika testified that to exit their backyard, the person "would have to climb the fence." Natika further testified that in the two videos, which are 18 and 12 seconds long respectively, the bathroom light is on. Natika and her husband decided to call the police because "we had the image of someone being on my property at that time and engaging, obviously, with my son."

{¶ 13} Natika, her husband, and her older daughter asked K.V. to tell them what happened. According to Natika, K.V. was "terrified," and when the police arrived, an officer "intervened, and he said, well, obviously he's not comfortable talking to you as parents." The officer suggested that he take K.V. and his sister to his police car, where K.V. could tell his sister what occurred, and the officer would listen.

{¶ 14} In June 2021, a Mayfield Heights police officer came to Natika's house to take pictures of K.V., the bathroom, and the backyard. Natika testified that the officer took pictures when it was dark outside, so that "it would look like when it was nighttime" at the house. Natika gave the police K.V.'s phone and her husband signed a release or a waiver. Natika testified that she gave her consent to the police to "engage" the individual, who was later identified as Ruediger, after he "was still * * * sending messages" to K.V.'s phone.

{¶ 15} Natika testified that she learned that K.V. "was exploring sexuality," which was "fine with" her, but she felt like, at 13 years old, K.V. should not have been exposed to "adult applications." K.V. "was on several different sites. Curiosity, I guess. Exploring, you know, what he felt may be his lifestyle." Natika explained that the sites were "gay sites, dating apps."

**B. Tonya Anderson**

{¶ 16} Tonya Anderson ("Tonya") testified that she is K.V.'s older sister, and she lives in Mayfield Heights with her mom, her stepdad, her brother K.V., and her younger sister. At the time of trial, Tonya was 26 years old and K.V. was 15 years

old.  Despite the age difference, Tonya and K.V. are "very close."  Tonya testified that K.V. has Snapchat on his phone, and within Snapchat is a feature that shows "the direct location of where you [are] at."

{¶ 17} Tonya testified that on the morning of April 25, 2021, Natika woke her up and told her "there was an incident."  Tonya's testimony continued:

> So I went downstairs and she alerted me that [K.V.] had been talking to someone via Snapchat and it was in an explicit nature.  And she showed me some of the texts.  And while I was scrolling, I decided to save the messages.  And I was shocked because, like I said, [K.V.] follows me everywhere, he's very, very supportive of the things I do and he follows me on [social media] and things of that.

{¶ 18} Asked why she saved the messages on K.V.'s phone, Tonya replied as follows: "Because what I read was extremely explicit and I wanted to be sure that we could look back on these, because obviously I knew we were going to have to take some action toward what was happening and things like that."  Tonya testified about the pictures that she saved from K.V.'s phone.  These pictures were "from" someone with a user name of "Johnr4487."  Tonya also saved "a conversation between John R. and" K.V.  According to Tonya, she did not save all the messages or pictures.  Tonya further testified that she sat in the police car with her brother while he gave a statement to the police, and in June 2021, she "made a written statement."

**C. The Electronic Messages**

{¶ 19} Printouts of the following Snapchat messages between Ruediger and K.V. were introduced into evidence.  All these messages were saved by Tonya to K.V.'s phone.  The first message from K.V. was sent sometime on April 24, 2021.  The remaining messages were sent sometime after midnight on April 25, 2021.

K.V.: So today around 5 pm meet up in my bathroom and we do it then you leave and we talk about it when you get home or when I see my dad leave the drive way

K.V.: I am going to eat and pretend I am going to in the shower

Ruediger: Yes. As soon as I saw you in the window, I started to get hard. When I finally got up to the window and saw how cute you were, I was really hard

K.V.: Yes I do have one

Ruediger: Damn. I wish we could've jerked each other off tonight for real

K.V.: Do you want to now or later cause I would like a jerk off buddy

{¶ 20} Accompanying K.V.'s messages are five pictures of his genitalia. No pictures of, or sent by, Ruediger were included among these exhibits.

**D. K.V.**

{¶ 21} K.V. testified that his date of birth is June 26, 2007, and he was 13 years old in April 2021. At that time, he was living with his parents and two sisters in Mayfield Heights. K.V. had a cell phone, and the social media app Snapchat was on his phone. Tonya helped him set up his Snapchat account. K.V. used his phone to access "gay dating web sites," including Grindr, in April 2021. According to K.V., Grindr is "mainly used for hookups," which he described as "[m]eeting up with people." K.V. testified that he had a Grindr account, and, although he was only 13 years old at the time, "[y]ou had to be older than 18" to set up a profile on Grindr. According to K.V., he lied about his age, and his Grindr profile said that he was 18 years old. K.V. testified that he did not remember his Grindr user name or what the

photograph he used when setting up his profile looked like. K.V. testified that he just remembered it was not a photograph of him.

{¶ 22} K.V. testified that he would "meet" people on Grinder and have conversations with them. According to K.V., he would "get rid of" the conversations rather than save them. Asked specifically how he "started" his communication with Ruediger in April 2021 on Grindr, K.V. replied, "I don't really remember how that started." K.V. further testified that he "thought" Ruediger messaged him first. The conversation between K.V. and Ruediger eventually moved to Snapchat, which was Ruediger's idea. The two began by talking about things they were "interested in" and their "personal lives." Asked if the conversation got "sexual," K.V. answered, "At some other point. * * * I'm not sure when, but it was later on during the conversation." K.V.'s testimony continued:

> Q: Okay. Before the conversation got sexual, did you reveal any personal details about yourself?
>
> A: Yes.
>
> Q: Okay. What personal details did you reveal?
>
> A: My age was actually 13.
>
> Q: Okay. So you told the other person in the conversation on Snapchat that you were 13 years old before the conversation got sexual?
>
> A: Yes.

{¶ 23} Asked what the "tone" or "gist" of the sexual conversation was, K.V. testified that he could not remember. He further testified that he and Ruediger were exchanging "[m]ainly photos and videos" when they initially began communicating.

K.V. testified that he was "pretty sure" he sent the first photo to Ruediger on Snapchat. According to K.V., this first photo was "probably of [his] private area." K.V. clarified that the picture was of his penis. K.V. testified that Ruediger did not send K.V. photos. K.V. also testified that he sent videos of his penis to Ruediger, but that Ruediger did not send "videos back." K.V. testified that he sent the photos and videos to Ruediger because Ruediger told him to.

{¶ 24} During their Snapchat conversation, K.V. and Ruediger discussed meeting in person. Asked where they discussed meeting, K.V. answered, "The bathroom window" at the "back of the house." According to K.V., Ruediger knew where to go because K.V.'s "location was on" in the Snapchat app. K.V. "only knew" that Ruediger arrived because Ruediger sent K.V. a picture of the front of K.V.'s house with a message that said, "Is this your house?" Asked what happened next, K.V. testified as follows: "He went over to the next street, which is — there are two streets and it's divided into two, which is East and West Minor. And so he went to the other street, climbed over the fence, and was in the backyard of my house."

{¶ 25} K.V. testified that Ruediger arrived at his house at midnight, and it was dark outside. According to K.V., when Ruediger arrived at the house, K.V. saw him "only because he waved his phone from — from over where he jumped over the fence." K.V. was standing in the first-floor bathroom with the light on. Ruediger came to the bathroom window, which is in the back of the house. K.V. testified that the blinds on the bathroom window were "shut," but he could see Ruediger through the window. Asked to describe who he saw, K.V. said, "Well, the only thing that I

knew, from — from what I saw, was that he was wearing a suit, because he told me that he was."

{¶ 26} Asked how long Ruediger stayed at the window, K.V. replied, "He is not there for long, because I told him to leave." K.V. testified that Ruediger was there for a "few seconds" before K.V. "texted him to leave." Ruediger "climbed back over the fence and left." According to K.V., he and Ruediger did not speak at all that night.

{¶ 27} K.V. woke up the next morning to his mom screaming at him that "there was a dude at the house." K.V.'s parents had his phone, and Tonya became involved because she "knew more about Snapchat." The police came to the house that day and talked to K.V. According to K.V., "they wanted information on what happened the night before and — that would help them lead to whoever came to the house." K.V. identified the electronic Snapchat messages sent between him and Ruediger, who went by the username of "Johnr4487."

{¶ 28} According to K.V., the pictures that the police took of him sitting in the bathroom were taken with the bathroom light on. K.V. testified that the bathroom light was also on the night Ruediger came to the window. K.V. testified that the police officer was standing outside in the backyard "in the same place" that Ruediger was standing when the officer took the picture of K.V. through the bathroom window. K.V. further testified that he could see his face in the picture that the officer took. K.V. was sitting on the toilet when the picture was taken, and he was sitting on the toilet when Ruediger came to the window.

{¶ 29} During K.V.'s testimony, the state played the surveillance video of his backyard from the night at issue showing Ruediger approaching the bathroom window. K.V. testified that he could see in the video that the bathroom light was on, and the bathroom window blinds were open. The man stopped at the bathroom window for a few seconds, walked down the stairs of the patio to leave, and climbed over the fence.

{¶ 30} On cross-examination, K.V. testified that he did not remember what date of birth he used to set up his Grindr profile, but he calculated a date of birth that made him "at least 18 years old." Defense counsel asked K.V. what he meant when he testified on direct examination about "meeting up with people" on Grindr, and K.V. answered, "Sex."

{¶ 31} Defense counsel questioned K.V. about when the police interviewed him while he and Tonya were in the police car.

Q: Do you remember [the officer] asking you: Did he, meaning [Ruediger] ever ask how old you were? * * *

A: Yes.

Q: What was your response?

A: I told him that I was 13.

Q: You told [the officer] in his police cruiser that you told [Ruediger] that you were 13?

A: Yes.

{¶ 32} Defense counsel played the body camera video from the police officer who interviewed K.V. This video was shown only to K.V., using a laptop and

headphones. The body camera video was not played for the jury, and it was not introduced into evidence. After the video, the following colloquy occurred between defense counsel and K.V.:

Q: Do you remember [the officer] asking you: Did you ever tell [Ruediger] what your age really was?

A: I did eventually.

* * *

Q: After listening to that small clip, do you now remember a different response that you provided us here in court?

A: Yes.

Q: And what was your response to [the officer] the second time he asked you: Did you ever tell him in your conversation how old you were?

A: I said: I never did.

{¶ 33} On redirect examination, K.V. explained that he "eventually" told Ruediger that he was 13 years old when their conversation "moved to Snapchat." K.V. also explained that the picture he put on his Grindr profile was not of a person. Rather, it was "[j]ust words" from "the title of [a] TV show."

{¶ 34} K.V. clarified that when he was in the bathroom that night, "at first" he was standing, and then he sat down. K.V. also clarified that the blinds on the bathroom window "were so I could see out" on the night at issue.

{¶ 35} On recross-examination, K.V. testified that when he was talking to the police officer in the car, they were discussing the conversations he and Ruediger had

"through Snapchat." Asked if he discussed his and Ruediger's Grindr conversation with the officer, K.V. replied, "I don't think I did."

### E. Gary Stein

{¶ 36} Gary Stein ("Stein") testified that he was a retired special investigator for the Cuyahoga County Prosecutor's Office. Stein's training was in digital forensics. According to Stein, "most of the work I did was with cell phones." In relation to this case, Stein was asked to examine two cell phones that belonged to Ruediger. Stein testified that both phones "were never unlocked," which means he was unable to "get into" photos or videos.

### F. Filipp Goykhberg

{¶ 37} Filipp Goykhberg ("Off. Goykhberg") testified that he is a patrol officer for the Mayfield Heights Police Department. Off. Goykhberg was involved in Ruediger's case because he is "a younger officer," and "they just needed help with Snapchat." Off. Goykhberg testified that he was working with K.V.'s phone and Snapchat account. His "goal * * * was just to have [Ruediger] come out to Mayfield Heights to meet the 13-year-old juvenile at a specific location." According to Off. Goykhberg, there was nothing sexual about his (while posing as K.V.) Snapchat conversation with Ruediger, which occurred on April 29, 2021, between 3:43 p.m. and 3:52 p.m.

### G. Officer Josh Bayer

{¶ 38} Mayfield Heights Police Department Patrol Officer Josh Bayer ("Off. Bayer") testified that he received a call at approximately 8:30 a.m. on April 25, 2021,

to respond to a "possible sex crime against a child." When Off. Bayer arrived at K.V.'s house, K.V.'s parents showed Off. Bayer the two security-camera videos of the backyard. Off. Bayer testified that the first video showed a tall white male wearing a suit who "came from the back yard, went up the stairs to the deck and approached a window at the — the light was on in the room." Off. Bayer further testified that the second video showed the same man "exiting from the deck at the bottom of the stairs * * *."

{¶ 39} Off. Bayer "took [K.V.] outside and had him sit in the front seat of [the] patrol car and his sister had a seat in the back seat of [the] patrol car." Off. Bayer brought K.V.'s cell phone with them and began to interview K.V. According to Off. Bayer, K.V.'s phone showed "social media apps that had conversation between [K.V.] and a subject." Off. Bayer identified the "photographs of the conversation" that he "saw on [K.V.'s] phone [in] Snapchat on April 25th." Off. Bayer testified that the "suspect" in this case had a Snapchat username of "Johnr4487."

{¶ 40} According to Off. Bayer, in addition to the Snapchat conversation he saw on K.V.'s phone, he also saw "[p]ornographic photos, photos of erect penises." Off. Bayer determined, through the conversation on K.V.'s phone, that one of penises was K.V.'s

### H. Sergeant Donald Oberdoester

{¶ 41} Sergeant Donald Oberdoester ("Sgt. Oberdoester"), of the Mayfield Heights Police Department, testified that he was working as a "detective and

sergeant" when he was assigned to the instant case on April 26, 2021. Sgt. Oberdoester testified that he learned the following after reading Off. Bayer's report: "I learned that [K.V.'s] parents had called the police department, they were concerned that they found things on their son's phone. And as they went through the phone by the text messages, that it appears somebody came to their house the previous night and so they called the police." Sgt. Oberdoester further testified that the "user name * * * for the Snapchat account of the person that was communicating with their child was johnr4487." Sgt. Oberdoester investigated that username and ultimately connected it to Ruediger.

{¶ 42} The police received permission from K.V.'s parents to "search [K.V.'s] phone and use [K.V.'s] phone." On April 29, 2021, Sgt. Oberdoester had not yet "done anything" with K.V.'s phone, but he "noticed that [the] phone had received a text message from johnr4487. And if I remember right, it said, 'Hey, what's up?' Or something like that." Sgt. Oberdoester called Off. Goykhberg to assist with responding to the message. After some back and forth between the police, posing as K.V., and Ruediger, they decided to meet at Bruegger's Bagels, which is where the police arrested Ruediger.

{¶ 43} Sgt. Oberdoester next testified about the April 29, 2021 audio and video recording of Ruediger's interrogation at the Mayfield Heights Police station. In this recording, Ruediger acknowledged going up to the back window of K.V.'s house. Sgt. Oberdoester asked Ruediger about K.V.'s age, and Ruediger said that he "thought maybe 16 or 17." Asked if Ruediger saw K.V.'s face, Ruediger answered, "I

guess, yeah." Ruediger admitted that he "got a clear look at" K.V., who was sitting on the toilet at the time, although he said K.V. was looking down at his phone, and Ruediger did not get a direct look at his full face. However, moments later during this video, Ruediger said that he "never saw his face I guess."

{¶ 44} In the video, Ruediger stated the following: "Is there a chance I thought he wasn't 18 and was closer to 16, yeah. * * * If you would have told me he was 15, I would have agreed." Ruediger also admitted that he "sent some dick pics" to K.V. and he "received dick pics from" K.V.

## III. Law and Analysis

### A. Motion to Suppress

{¶ 45} In his first assignment of error, Ruediger argues that the trial court erred by denying his motion to suppress the statements he made to the police during his detention. Specifically, Ruediger argues that the police violated various constitutional and statutory rights when they "held him overnight without allowing him to call anyone, including an attorney * * *." Ruediger argues that his Fifth Amendment right to remain silent and right against self-incrimination were violated; his Fourteenth Amendment right to due process was violated; and his right to communicate with an attorney under R.C. 2935.20 was violated. Ruediger further argues that, as a result of the police holding "him overnight, without charging him and without allowing him access to a phone," he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights.

### 1. Suppression Hearing Testimony

### a. Detective Mikolay

{¶ 46} Detective Matthew Mikolay ("Det. Mikolay") testified that he is employed by the Mayfield Heights Police Department. On the date of the offense in the case at hand, Det. Mikolay was a patrol officer. On April 29, 2021, Det. Mikolay was in a police vehicle with another officer "down the street from what turned out to be the location where * * * Ruediger was stopped." Det. Mikolay testified that he "understood" that Ruediger "was involved in an inappropriate relationship with a 13-year-old who was a resident" of Mayfield Heights. Det. Mikolay was present when Ruediger "showed up" at the arranged meeting place, which was a Bruegger's Bagels. According to Det. Mikolay, he asked Ruediger "to step out of the vehicle, keep his hands where we could see them. [Ruediger] was eventually placed in the back of a police cruiser and after a short period of time I did advise him of his *Miranda* warnings." The prosecutor played video footage from Det. Mikolay's body camera on the day in question showing Det. Mikolay advising Ruediger of his *Miranda* rights.

{¶ 47} Det. Mikolay and another officer brought Ruediger back to the police station to "begin the booking process." During this process, Det. Mikolay asked Ruediger "if he had any questions, concerns, or complaints, to which he replied, no." This interaction was also captured on Det. Mikolay's body camera, and the video was played for the court. The video showed another officer "explaining [to Ruediger] the process of what was gonna take[] place from that point on. He explained to

[Ruediger] the detectives were going to talk to him the following day and he would have to spend the night in the Mayfield Heights jail and he was not allowed to make any phone calls at that point." According to Det. Mikolay, the reason Ruediger was not allowed to make a phone call at that point was "probably * * * to preserve evidence."

{¶ 48} Asked "when did * * * Ruediger ask to make a phone call [or] call his attorney," Det. Mikolay answered, "He never did." According to Det. Mikolay, "once the booking process is complete, the individual that's processed should be allowed two phone calls." Det. Mikolay further explained that when he said Ruediger was "not allowed to have phone calls," this did not include calling an attorney.

{¶ 49} On cross-examination, Ruediger's counsel asked Det. Mikolay if there were times, such as when he walked out of the booking room, when he would have been unable to hear what Ruediger and the other officer were saying. Det. Mikolay answered that this was "correct." Det. Mikolay was additionally asked if he "may be unaware as to whether or not [the other officer] asked * * * Ruediger if he currently had an attorney" or if Ruediger answered that he did not have an attorney and "would need a phone call to [get] one." Det. Mikolay responded, "I wouldn't know that [if] I wasn't in the room * * * at that time."

### b. Sergeant Oberdoester

{¶ 50} Sgt. Oberdoester testified that he was the lead detective on Ruediger's case, which was assigned to him on April 26, 2021, and he confiscated K.V.'s cell phone as evidence. K.V.'s father gave Sgt. Oberdoester permission to search and use

K.V.'s phone. After searching the phone, Det. Oberdoester used it to communicate with Ruediger and set up a meeting at the designated Bruegger's Bagels. Ruediger "showed up" as arranged, and the police arrested him, towed his vehicle, and transported Ruediger to the police station for booking.

{¶ 51} According to Sgt. Oberdoester, he was not part of Ruediger's booking process, although he made the decision "about [Ruediger] having phone calls." Sgt. Oberdoester explained that "[t]his was an ongoing investigation, [and] it was still early on. * * * But if what our victim was telling us about exchanging contraband on their cell phones, it was reasonable to believe that there would be contraband found on home computers, as well. So we didn't want [Ruediger] to make a phone call to someone at home that could possible compromise that evidence."

{¶ 52} Sgt. Oberdoester testified that, according to policy, suspects are "allowed to make phone calls after the booking procedure"; however, "an exception was made to the policy" in Ruediger's case because "we didn't want evidence to be destroyed * * *." Sgt. Oberdoester further testified that this exception happens more often than not.

{¶ 53} Sgt. Oberdoester also testified that he read the *Miranda* rights to Ruediger after Ruediger was booked, and Ruediger signed a "*Miranda* warning waiver." This written waiver was introduced into evidence and is consistent with Sgt. Oberdoester's testimony. Part of this written waiver that Ruediger read and signed includes an explanation that Ruediger was able to call an attorney. According to Sgt. Oberdoester, Ruediger "was asked if he wanted an attorney," but Ruediger

did not ask for an attorney. Rather, Ruediger made a statement to the police that was recorded on video.

{¶ 54} On cross-examination, Sgt. Oberdoester testified that despite the written waiver, Ruediger was told by two law enforcement officers that he was not permitted to make phone calls.

{¶ 55} As part of his investigation into the incident at issue in this case, Sgt. Oberdoester viewed the "surveillance video from the victim's house, and * * * did computer searches trying to figure out this e-mail address or the tag name with the numbers on it." According to Sgt. Oberdoester, he was trying to find out who "johnr4487" was. The sergeant's research led him to Ruediger.

### c. Chief Mele

{¶ 56} Mayfield Heights Chief of Police Anthony Mele ("Chief Mele") testified that he became involved in the Ruediger investigation to "assist [in] affecting [sic] an arrest * * *." Chief Mele's role "was going to be one of the uniformed officers in a parked police car * * *" at the designated meeting place. Chief Mele had no "dialogue" with Ruediger "at the scene," but he transported him back to the station after the arrest. Chief Mele was also "one of the booking officers." Chief Mele testified that Det. Mikolay read Ruediger his *Miranda* rights. Chief Mele was aware that a decision was made not to allow Ruediger to make phone calls because he "was concerned that, if [Ruediger] made phone calls, he may contact someone at his residence to possibly destroy evidence." According to Chief Mele,

Ruediger "never asked for an attorney. Had he, we certainly would have given him a phone call."

{¶ 57} On cross-examination, Chief Mele testified that he did not recall whether anyone asked Ruediger if he had an attorney, and Chief Mele did not recall Ruediger saying that he did not have an attorney, "but would need to call one." According to Chief Mele, when Sgt. Oberdoester told Ruediger that he was not allowed to make phone calls, Sgt. Oberdoester "wasn't specific. But I knew what he meant. I knew that he meant personal phone calls because we would never deny him a call to an attorney." Chief Mele testified that Ruediger "may not" have known this distinction, "[b]ut he was also given the opportunity to ask questions. He was also read his *Miranda* rights before that and never requested an attorney."

{¶ 58} After listening to the testimony presented at the suppression hearing, the trial court found that Ruediger "never asked to call his attorney or anyone else. * * * So * * * after booking he was allowed to make two calls and he declined. They asked him if he had any complaints or anything, he answered no." The court further stated that it did not "find any reason to suppress this — any testimony in this case that I've heard thus far." However, the court stated that it could not "rule yet" because it had not "heard it all."

### 2. Standard of Review

{¶ 59} In *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8, the Ohio Supreme Court held the following:

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court

assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills* (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning* (1982), 1 Ohio St.3d 19, 1 OBR 57, 437 N.E.2d 583.

Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

### 3. Waiver of *Miranda* Rights

{¶ 60} "A suspect in police custody 'must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of any attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *State v. Lather*, 110 Ohio St.3d 270, 2006-Ohio-4477, 853 N.E.2d 279, ¶ 6, quoting *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

{¶ 61} The United States Supreme Court has explained that *Miranda* rights can be waived, and a valid waiver has two aspects:

First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

(Citation omitted.) *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). The Ohio Supreme Court has further explained that a "suspect's

decision to waive his Fifth Amendment privilege against compulsory self-incrimination is made voluntarily absent evidence that his will was overborne and his capacity for self-determination was critically impaired because of coercive police conduct." *State v. Dailey*, 53 Ohio St.3d 88, 91, 559 N.E.2d 459 (1990).

### 4. **Right to Make a Phone Call**

{¶ 62} To support his argument that the police violated his "right to make a phone call," Ruediger cites R.C. 2935.20, which governs a suspect in a criminal investigation's right to counsel. This statute states as follows:

> After the arrest, detention, or any other taking into custody of a person, with or without a warrant, such person shall be permitted forthwith facilities to communicate with an attorney at law of his choice who is entitled to practice in the courts of this state, or to communicate with any other person of his choice for the purpose of obtaining counsel. Such communication may be made by a reasonable number of telephone calls or in any other reasonable manner. Such person shall have a right to be visited immediately by any attorney at law so obtained who is entitled to practice in the courts of this state, and to consult with him privately. No officer or any other agent of this state shall prevent, attempt to prevent, or advise such person against the communication, visit, or consultation provided for by this section.

{¶ 63} In *State v. Griffith*, 74 Ohio St.3d 554, 555, 660 N.E.2d 710 (1996), the Ohio Supreme Court answered a certified question from the Fifth District Court of Appeals, ruling that suppression of the results of a breathalyzer test "because of police failure to comply with * * * R.C. 2935.20" is not an appropriate remedy. *See also State v. Turner*, 11th Dist. Portage No. 2007-P-0090, 2008-Ohio-3898, ¶ 30 (holding that "the exclusionary rule is not a remedy for a violation of R.C. 2935.20").

### 5. Application of the Law

{¶ 64} In applying *Griffith* to the case at hand, we conclude that suppression of Ruediger's statements to police is not the appropriate remedy for the alleged violation of R.C. 2935.20. We further find no evidence in the record to support Ruediger's argument that his *Miranda* waiver was not made knowingly, voluntarily, and intelligently. Accordingly, Ruediger's first assignment of error is overruled.

### B. Sufficiency of the Evidence and Manifest Weight of the Evidence

{¶ 65} In his second assignment of error, Ruediger argues that his conviction for disseminating matter harmful to juveniles is based on insufficient evidence. Specifically, Ruediger argues that the state presented insufficient evidence that the "electronic messaging" was obscene; he had "reason to believe" K.V. was a juvenile; and he acted recklessly.

{¶ 66} In Ruediger's third assignment of error, he argues that his conviction for disseminating matter harmful to juveniles is against the manifest weight of the evidence in the same three aspects as specified in his second assignment of error: the "electronic messaging" was not obscene; he did not have "reason to believe" K.V. was a juvenile; and he did not act recklessly.

{¶ 67} To reiterate, Ruediger sent the following electronic messages to K.V. after seeing K.V. in the bathroom window: "As soon as I saw you in the window, I started to get hard. When I finally got up to the window and saw how cute you were, I was really hard[.]" and "Damn. I wish we could've jerked each other off tonight for real[.]"

{¶ 68} "[A]n appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 273, 574 N.E.2d 492 (1991). "A challenge to the sufficiency of the evidence supporting a conviction requires the court to determine whether the prosecution has met its burden of production at trial." *State v. Toby*, 8th Dist. Cuyahoga No. 106306, 2018-Ohio-3369, ¶ 19. That is, "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph one of the syllabus. "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 69} A manifest-weight-of-the-evidence challenge "addresses the evidence's effect of inducing belief. * * * In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as the 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Thompkins* at 387. Reversing a conviction under a manifest weight theory "should be exercised only in the exceptional case in which the evidence weighs heavily against the

conviction." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

### 1. Disseminating Matter Harmful to Juveniles

{¶ 70} R.C. 2907.31(A)(1) states that "[n]o person, with knowledge of its character or content, shall recklessly * * * [d]irectly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile * * * any material or performance that is obscene or harmful to juveniles * * *." A violation of this statute is a fifth-degree felony if the material is obscene.

{¶ 71} The legislature further explained that a "person * * * disseminates * * * material * * * to a juvenile * * * in violation of this section by means of an electronic method of remotely transmitting information if the person knows or has reason to believe that the person receiving the information is a juvenile * * *." R.C. 2907.31(D)(1).

{¶ 72} In R.C. 2907.01(I), the legislature defined "juvenile" as follows: "an unmarried person under the age of eighteen." Furthermore, in R.C. 2907.01(E), the legislature defined "harmful to juveniles" as follows:

> "Harmful to juveniles" means that quality of any material or performance describing or representing nudity, sexual conduct, sexual excitement, or sado-masochistic abuse in any form to which all of the following apply:
>
> (1) The material or performance, when considered as a whole, appeals to the prurient interest of juveniles in sex.
>
> (2) The material or performance is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable for juveniles.

(3)  The material or performance, when considered as a whole, lacks serious literary, artistic, political, and scientific value for juveniles.

### 2.  Obscenity

{¶ 73} First, Ruediger argues that the messages he sent to K.V. were "sexual" but not obscene.  R.C. 2907.01(F) states that content is "obscene" if:

(1) Its dominant appeal is to prurient interest;

(2) Its dominant tendency is to arouse lust by displaying or depicting sexual activity, masturbation, sexual excitement, or nudity in a way that tends to represent human beings as mere objects of sexual appetite * * *.

{¶ 74} The Ohio Supreme Court stated the following regarding "prurient interest":

A "prurient" interest is not the same as a candid, normal or healthy interest in sex, rather it is a "'shameful or morbid interest in nudity, sex, or excretion * * * [which] goes substantially beyond customary limits of candor in description or representation of such matters * * *.'"

*Urbana ex rel. v. Newlin,* 43 Ohio St.3d 109, 116, 539 N.E.2d 140 (1989), quoting *Roth v. United States*, 354 U.S. 476, 487, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957), fn. 20 (quoting the definition of the *A.L.I. Model Penal Code*, Section 207.10(2) [Tent. Draft No. 6, 1957]).

### 3.  Mens Rea — Recklessly

{¶ 75} Next, Ruediger argues that the state "did not present evidence sufficient to prove that [he] acted recklessly when messaging K.V." and "he had no reason to believe that K.V. was a juvenile."

{¶ 76} R.C. 2901.22(C) states that a

person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist.

### 4. Analysis

{¶ 77} The gist of Ruediger's arguments under his second and third assignments of error is twofold. First, that the electronic messages he sent K.V. are not obscene, and second that he did not know, or act recklessly in that regard, that K.V. was a juvenile. We review these arguments together.

{¶ 78} As stated earlier in this opinion, K.V. testified that he told Ruediger he was 13 years old.

Q: Okay. Before the conversation got sexual, did you reveal any personal details about yourself?

A: Yes.

Q: Okay. What personal details did you reveal?

A: My age was actually 13.

Q: Okay. So you told the other person in the conversation on Snapchat that you were 13 years old before the conversation got sexual?

A: Yes.

{¶ 79} However, evidence was also presented that K.V. told Off. Bayer that he did not tell Ruediger his age.

{¶ 80} K.V. further testified that when Ruediger arrived at K.V.'s house on April 25, 2021, Ruediger "went to the other street, climbed over the fence, and was

in the backyard of my house." K.V. was at the bathroom window, and the bathroom light was on. K.V. could see Ruediger in the backyard because the light from Ruediger's phone was illuminated. Ruediger walked across the patio and approached the bathroom window. According to K.V., Ruediger "just stands there for a few seconds." K.V. further testified that Ruediger was close enough for him to touch if the window and screen had not been there.

{¶ 81} K.V. testified that Ruediger was not there long because K.V. texted Ruediger and told him to leave. According to K.V., Ruediger "just walked away[,] climbed back over the fence and left."

{¶ 82} Evidence in the record shows that Ruediger sent K.V. two messages in which Ruediger admitted to seeing K.V. in the bathroom window: "I saw you in the window * * *"; and "* * *I finally got up to the window and saw how cute you were * * *." Evidence in the record also shows that K.V. referred to his dad leaving the driveway and pretending to be in the shower in the messages he sent to Ruediger.

{¶ 83} Additionally, the video of Ruediger's police interrogation reveals that he admitted that he thought K.V. could have been 15, 16, or 17 years old.

{¶ 84} Upon review, we find sufficient evidence in the record to support Ruediger's disseminating-matter-harmful-to-juveniles conviction. K.V. testified that he told Ruediger he was 13 years old, and Ruediger told the police he thought K.V. could have been under 18. The messages at issue refer to sexual conduct and sexual excitement, which, in this case, are obscene for the very reason that they were

sent to a juvenile. This evidence, if believed, is enough to convince a reasonable person of Ruediger's guilt.

{¶ 85} Our analysis of Ruediger's manifest-weight-of-the-evidence challenge turns on the credibility of the witnesses and evidence presented at trial. Ohio courts have uniformly held that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). The factfinder "is in the best position to observe the witnesses' demeanor, voice inflection, and mannerisms, in order to determine the credibility of each witness." *State v. Dowd*, 8th Dist. Cuyahoga No. 80990, 2002-Ohio-7061, ¶ 23. "Furthermore, a trier of fact is free to believe all, some, or none of the testimony of each witness appearing before it." *State v. Williams*, 2019-Ohio-794, 132 N.E.3d 1233, ¶ 28 (8th Dist.).

{¶ 86} In *State v. Koran*, 8th Dist. Cuyahoga No. 110923, 2022-Ohio-2410, ¶ 52, this court affirmed the defendant's disseminating-matter-harmful-to-juveniles conviction under circumstances somewhat similar to the case at hand. Obscenity was not at issue in *Koran*, because the messages he sent to the juvenile victim were sexually explicit photographs. However, Koran disputed whether he knew that the recipient of the pictures was allegedly 15 years old.

> The state put forth evidence showing that "Jay" sent Koran a message that "Jay" was 15 years old. Koran does not dispute this. Rather, Koran argues that he did not see the message and, therefore, had no knowledge of "Jay's" purported age and did not act recklessly in that regard.
>
> * * *

Having reviewed the record in the case at hand, we cannot say that the trial court, acting as the factfinder, lost its way by convicting Koran of the offenses with which he was charged. The trial court heard the state's evidence, as well as the state's position that Koran knew "Jay's" age or acted recklessly in that regard. The trial court also heard Koran's testimony that he did not know "Jay's" age, because he did not see the message at issue, and Koran's explanation of why he may not have seen this message. This is not the exceptional case, which creates "such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 547.

*Koran* at ¶ 50, 52.

{¶ 87} Upon review, we find that the weight of the evidence in the record supports Ruediger's conviction. We note that K.V.'s testimony at trial that he told Ruediger his age is inconsistent with a recording that revealed, on the morning after the offenses occurred, he told Off. Bayer that he did not tell Ruediger his age. We also note that K.V. was 13 years old when the offenses occurred, and evidence in the record showed that he was shy and uncomfortable talking about what happened.

{¶ 88} Notwithstanding this inconsistency, other evidence in the record supports a finding that Ruediger knew K.V. was a juvenile. K.V. lived with his parents, told Ruediger that he was pretending to take a shower so he could meet Ruediger at the bathroom window, and told Ruediger that he could not talk until his dad left the driveway. Ruediger parked on a different street than the one on which K.V. lived, jumped a fence, came through K.V.'s backyard, and met at K.V.'s bathroom window. Ruediger also admitted to seeing K.V. in the bathroom window. Our review of the pictures that the police took shows that K.V. is clearly a juvenile, and Ruediger admitted to the police that he thought K.V. could be a juvenile.

{¶ 89} Having determined that Ruediger knew, or acted recklessly in that regard, that K.V. was a juvenile, we also conclude that electronic messages at issue were obscene because they were sexual in nature, and they were sent to a juvenile. The jury did not lose its way in convicting Ruediger of disseminating matter harmful to juveniles. Accordingly, Ruediger's second and third assignments of error are overruled.

### C. Jury Instruction — Inferior Offense

{¶ 90} In Ruediger's fourth assignment of error, he argues that "the trial court committed plain error in failing to provide a jury instruction for an inferior degree of the disseminating-matter-harmful-to-juveniles charge." Ruediger specifically argues that "if the material [disseminated] is not obscene, th[e]n the violation is a first-degree misdemeanor * * *."

{¶ 91} Pursuant to Crim.R. 30(A), "[o]n appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Failure to object to jury instructions "waives all but plain error." *State v. Owens*, 162 Ohio St.3d 596, 2020-Ohio-4616, 166 N.E.3d 1142 ¶ 7.

{¶ 92} As stated previously in this opinion, R.C. 2907.31(A)(1) provides that "[n]o person, with knowledge of its character or content, shall recklessly * * * [d]irectly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile * * * any material or performance that is obscene or harmful to juveniles

* * *." Pursuant to R.C. 2907.31(F), "[i]f the material or performance involved is harmful to juveniles * * * a violation of this section is a misdemeanor of the first degree." However, the statute also states that "[i]f the material or performance involved is obscene, * * * a violation of this section is a felony of the fifth degree."

{¶ 93} Our review of the record reveals that Ruediger was indicted for disseminating matter harmful to juveniles, a fifth-degree felony, based on the material being obscene. Ruediger's indictment specifically references "material or performance that is obscene." His indictment does not state that the material is "harmful to juveniles."

{¶ 94} Our review of the trial court's instructions to the jury in the case at hand shows that the court stated, in part, as follows: "Before you can find the defendant guilty of disseminating matter harmful to juveniles, you must find beyond a reasonable doubt that * * * Ruediger * * * did recklessly * * * disseminate * * * to [K.V.] * * * material or performance that is obscene * * *." In other words, the court mirrored the language in Ruediger's indictment, omitting the alternative that the material involved is "harmful to juveniles."

{¶ 95} We previously determined that the evidence presented to the jury supported the finding that the messages at issue in this case are obscene. Furthermore, the jury found Ruediger guilty of the degree of the offense with which he was charged based on the instructions from the court.

{¶ 96} Accordingly, the court did not err by failing to instruct the jury on an inferior degree of disseminating matter harmful to juveniles. *Compare State v.*

*Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988) (holding that a jury instruction "on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense"). Ruediger's fourth assignment of error is overruled.

### D. Admissibility of Pictures into Evidence

{¶ 97} In his fifth assignment of error, Ruediger argues that the "court erred [by] allowing pictures into evidence that were not accurate re-creations of the scene."

{¶ 98} We review the admissibility of evidence for an abuse of discretion. *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001). "Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 401 and if it is substantially similar to the object or occurrence that it is intended to represent." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, 984 N.E.2d 948, ¶ 82. Evid.R. 401 states that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Additionally, the "admission of demonstrative evidence is subject to Evid.R. 403." *Jones* at ¶ 82. Evid.R. 403(A) states that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury."

{¶ 99} Specifically, Ruediger argues that testimony established the bathroom window was closed and the blinds were down when the incident occurred and this obstructed the view into the bathroom. Additionally, Ruediger argues it was dark outside when the incident occurred and K.V. is not visible through the bathroom window in the surveillance video.

{¶ 100} According to Ruediger, the photographs that the police took that were introduced into evidence differ from the testimony describing the scene in the following ways: in the re-created photographs, the bathroom window was open and the screen was removed; "the bathroom door is open and the hallway light is on, providing more light into the bathroom than on the night in question"; "K.V. is looking straight out the window"; "the pictures do not show that the exterior floodlight [was] illuminated * * * ."

{¶ 101} Our review of the trial testimony shows that K.V. testified about the surveillance video that was introduced into evidence showing Ruediger in his backyard approaching the bathroom window. According to K.V., the video shows that it was dark outside, the bathroom lights were on, and the blinds on the window were open when Ruediger was there. K.V. also testified about the photographs that the police took that were introduced into evidence. According to K.V., the photographs show that it was dark outside and the bathroom light was on. We also note that K.V. testified that he was sitting on the toilet when Ruediger came to the window, and he was sitting on the toilet when the police took the photograph.

**{¶ 102}** Upon review, we find that the photographs admitted into evidence showed the bathroom window under conditions that were substantially similar to the conditions on the night Ruediger was in the backyard. Furthermore, Ruediger stated to K.V., via two electronic messages, that he "saw" K.V. in the bathroom window that night. Therefore, we cannot say that the photographs "were not accurate re-creations of the scene." Ruediger's fifth assignment of error is overruled.

### E. Ineffective Assistance of Counsel

**{¶ 103}** In this sixth and final assignment of error, Ruediger argues that his "counsel rendered ineffective assistance at trial."

**{¶ 104}** To succeed on a claim of ineffective assistance of counsel, a defendant must establish that his or her attorney's performance was deficient and that the defendant was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* at 697. *See also State v. Bradley*, 42 Ohio St. 3d 136, 538 N.E.2d 373 (1989).

**{¶ 105}** In the case at hand, Ruediger argues that his counsel was ineffective for three reasons, i.e., by

> (1) Not requesting a mistrial when the State repeatedly tried to insinuate K.V. had pictures of [Ruediger's] penis on his phone;( 2) not requesting jury instructions and verdict forms providing the elements for a misdemeanor level dissemination of matter harmful to juveniles

offense pursuant to R.C. 2907.31; [and] (3) not arguing to the jury that the State failed to present evidence that [Ruediger] provided any obscene matter to K.V.

{¶ 106} Ruediger's second and third reasons that his trial counsel was ineffective relate to assignments of error two, three, and four, which we overruled previously in this opinion. Therefore, we conclude that counsel was not deficient in his performance regarding these issues. Ruediger's first reason that his counsel was ineffective — failing to request a mistrial when the state "insinuated" that there were pictures of Ruediger's penis on K.V.'s phone — is analyzed on the merits below.

{¶ 107} Specifically, Ruediger argues that "two different Mayfield Heights police officers testified about white penis pictures[1] found on K.V.'s phone. The obvious implication was to have the jury infer that these pictures were from" Ruediger.

{¶ 108} Ruediger admitted in his police interview that he sent "dick pics" to K.V. However, these pictures were not introduced into evidence, and they did not go back to the jury. Additionally, K.V. testified that Ruediger did not send him any pictures. Nonetheless, Off. Bayer and Sgt. Oberdoester testified that they saw pictures of what appeared to be a white penis on K.V.'s phone.

{¶ 109} Off. Bayer testified that he looked at K.V.'s phone when he, K.V., and Tonya were in his police car. Off. Bayer's testimony on cross-examination follows:

Q: And from looking at those photos could you tell if the people in the photos were white, black, Hispanic, Asian?

---

[1] Ruediger is a white male.

A:  There was at least one black male and it appears one white male.

* * *

Q:  And when you testified just a moment ago about there was at least one black penis and one white penis, those would have been in the pictures of the exhibits that you were shown here today?

A:  Yes.

Q:  And can you look back through these and see if you could find the one that has a white penis on it?

A:  Re-looking at it, * * * I do not believe that is a white man's penis.

Q:  Okay.  So after looking at the exhibits again, it refreshes your memory that there wasn't a white penis in those pictures; correct?

A:  Yes.

{¶ 110}  On re-direct examination, Off. Bayer stated that "Tonya was going through [K.V.'s] phone and found photos of a white male's erect penis and a white male ejaculating."

{¶ 111}  Sgt. Oberdoester testified that, as part of his investigation in this case, he reviewed K.V.'s "cell phone dump," which is a "forensic examination of the data" found on K.V.'s phone.  Sgt. Oberdoester found "some images" among this data, and testified as follows regarding the same: "There was a penis photograph of an erect penis, looking to be a white male."

{¶ 112}  Ruediger argues on appeal that this testimony is "false" because these alleged pictures were never recovered from K.V.'s phone.  We disagree. Defense counsel lodged an objection to Sgt. Oberdoester's testimony, which the court sustained at sidebar, stating as follows: "[S]ince you don't have an identifier,

you don't know who it came from.  Then, you know, then it looks like — in my mind, it looks like [K.V.] then is searching the internet and grabbing photos that he wants."

{¶ 113}  Upon review, we cannot say that Ruediger was prejudiced when his counsel did not request a mistrial related to this testimony.  As discussed, the electronic messages Ruediger sent to K.V. were sufficient to support his conviction for disseminating matter harmful to juveniles.  We previously determined that K.V. was a juvenile; Ruediger knew that K.V. was a juvenile, or recklessly acted in that regard; and the messages were obscene because they were sent to a juvenile.  It does not appear, from the record in the instant case, that the fleeting references during Ruediger's trial to a "white penis" influenced the jury.  The state established the elements of disseminating matter harmful to juveniles with evidence other than these references.  Therefore, these references did not prejudice Ruediger.  *See State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 89 ("An appellant alleging ineffective assistance of counsel because his attorney failed to move for a mistrial must establish that the trial court probably would have or should have declared a mistrial.  * * * A mistrial should not be ordered in a criminal case merely because some error or irregularity has occurred.  * * * It is only appropriate when the substantial rights of the accused or prosecution are adversely affected, and a fair trial is no longer possible.").

{¶ 114}  Accordingly, Ruediger's sixth and final assignment of error is overruled.

{¶ 115}  Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
FRANK DANIEL CELEBREZZE, III, J., CONCUR